IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ANA MARTINEZ,<br><br>Plaintiff,<br><br>v.<br><br>KATY INDEPENDENT SCHOOL DISTRICT,<br><br>Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. H-11-547 |

**MEMORANDUM AND RECOMMENDATION**

Presently pending before the court[1] is Defendant's Corrected Motion for Summary Judgment (Doc. 27) and the responses filed thereto. The court has considered the summary judgment motion, all relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **GRANTED**.

## I. Case Background

This employment discrimination action was filed by Plaintiff against her former employer, Defendant Katy Independent School District ("KISD" or "Defendant"). Plaintiff claims discrimination based on her Mexican national origin.

### A. Factual History

Plaintiff was hired by KISD in 2006 as a custodian.[2]

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 25.

[2] Doc. 30, Ex. A to Pl.'s Resp. to Def.'s Mot. for Summ. J. ("Pl.'s Resp."), Pl.'s Dep., p. 6.

Plaintiff worked at several schools before being transferred at her request to Winborn Elementary in March 2009.[3]

**1. Winborn Elementary ("Winborn")**

At Winborn, Plaintiff worked the 2:00 p.m. to 11:00 p.m. shift.[4] Plaintiff's supervisor was Maria Rivas ("Rivas"), who was from El Salvador.[5] Of the five custodians working that shift, two were Salvadoran, one was African-American, and two were Mexican.[6] Several months later, one of the Salvadoran custodians, Sandra, was replaced by Belia, who was of Mexican national origin.[7]

Plaintiff complained that Rivas directed disparaging comments to her based on her Mexican national origin. For example, according to Plaintiff, Rivas commented that only Mexicans would drive Chevy Trailblazers[8] and referred to Plaintiff on several occasions as "the woman in charro boots" when Plaintiff wore rubber boots to clean the restrooms.[9] Plaintiff claimed that Rivas also

---

[3] Id. at pp. 9-10. Plaintiff had a disciplinary record prior to her present complaints. In September 2007, Plaintiff received a verbal warning about talking loudly and rudely to a supervisor. In October 2008, Plaintiff was placed on six months probation for excessive absences. See Doc. 30, Ex. F to Pl.'s Resp., Def.'s EEOC Statement, p. 3.

[4] Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 12.

[5] Id. at pp. 10-11.

[6] Doc. 22, Ex. B to Def.'s Mot. for Summ. J., Decl. of Rivas, p. 1.

[7] Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 19.

[8] Id. at p. 15.

[9] Id. at p. 17. Rivas denied making any statement about Plaintiff's wearing charro boots or about the type of car Plaintiff drove. See Doc. 22, Ex. B to Def.'s Mot. for Summ. J., Decl. of Rivas, p. 3.

referred to Plaintiff as stupid,[10] and, on three or four occasions, pushed dirty plates in front of Plaintiff while she was in the break room and assigned her the largest and dirtiest areas of the school to clean.[11] Plaintiff also complained that Rivas commented that she had no idea that Mexicans ate vegetables, as opposed to "chili or hot food."[12]

In contrast, Rivas averred that she had to write up Plaintiff on several occasions for failing to follow her directives, for using foul and abusive language, for refusing to clean areas when directed by a supervisor and for behaving in a confrontational and aggressive manner.[13] Once, when Plaintiff complained about the weight of a vacuum, Rivas gave her a vacuum that was lighter.[14] However, this did not ameliorate the issue; rather, according to Rivas, Plaintiff continued to complain about her work load.[15] A reduction of Plaintiff's work area did not improve Plaintiff's behavior, according to Rivas.[16]

---

[10] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 17.

[11] Id. at p. 18; Doc. 30, Ex. B to Pl.'s Resp., Pl.'s Decl., p. 2.. Rivas denied making this comment, as well as others disparaging Plaintiff's national origin. See Doc. 30, Ex. C to Pl.'s Resp., Dep. of Maria Rivas, pp. 13-15.

[12] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 16.

[13] Doc. 22, Ex. B to Def.'s Mot. for Summ. J., Decl. of Maria Rivas, p. 1.

[14] Id.

[15] Id. at pp. 1-2.

[16] Id. at p. 2.

Plaintiff testified that in April and May 2009, Rivas told Sandra to refuse to open a locked back door to the school when Plaintiff knocked to gain entrance.[17] Plaintiff claimed that she observed Rivas open the door for a Salvadoran employee.[18] After Sandra left in June 2009, Belia opened the locked door for Plaintiff.[19] Also, from April 2009 to June 2009, Plaintiff claimed that Rivas made taunting statements about Plaintiff's national origin twice a week.[20]

In July 2009, Plaintiff spoke with Judy Gomez ("Gomez") about problems she was having at Winborn, including her complaints of national origin discrimination.[21] Gomez, who is of Mexican national origin,[22] was the supervisor over all custodians and custodial supervisors.[23] Plaintiff complained that Gomez did not give her the

---

[17] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., pp. 21-23. Apparently in the interests of security, the school principal ordered that all school doors except the front door be locked. Id. at p. 22. Plaintiff eventually gave up trying to enter through the locked back door and used the food service door. Id. at p. 21. Rivas denied instructing employees not to let Plaintiff in through the back door. See Doc. 30, Ex. C to Pl.'s Resp., Dep. of Rivas, p. 18. In fact, Rivas averred that she offered Plaintiff the "third key" position, which would allow Plaintiff to carry a key to the locked door, but Plaintiff refused. See Doc. 22, Ex. B to Def.'s Mot. for Summ. J., Decl. of Rivas, p. 3.

[18] See Doc. 30, Ex. B to Pl.'s Resp., Pl.'s Decl. ¶ 12.

[19] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 24.

[20] See Doc. 30, Ex. B to Pl.'s Resp., Pl.'s Decl., p. 2. Plaintiff failed to disclose what those comments were.

[21] See Ex. E to Pl.'s Resp., Dep. of Gomez, p. 10.

[22] See Doc. 22, Ex. E to Def.'s Mot. for Summ. J., Decl. of Scott Lamarr, p. 2.

[23] See Doc. 30, Ex. E to Pl.'s Resp., Dep. of Judy Gomez, p. 59.

courtesy of discussing the problems in Gomez's office but spoke with Plaintiff outside of her office.[24] According to Plaintiff, Gomez told Plaintiff that Aida Baca ("Baca"), who was Rivas's immediate supervisor, told her that Plaintiff was the problem, not Rivas.[25] Nonetheless, Gomez told Plaintiff that she would speak to Baca about her complaints.[26] Plaintiff asked to be transferred to another school, but Gomez refused that request.[27]

On August 31, 2009, Rivas asked Plaintiff what she had done with some bulletins that were in a particular classroom.[28] Plaintiff refused to discuss this with Rivas, and Rivas documented this as insubordinate behavior.[29] On September 8, 2009, Plaintiff refused to wash towels at the request of Rivas, stating that it was not her day to wash them.[30] On the following day, Plaintiff called

---

[24] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 29. In contrast, Gomez testified that she invited Plaintiff into her [Gomez's] office for the conversation. See Doc. 30, Ex. E to Pl.'s Resp., Dep. of Gomez, p. 7.

[25] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 30.

[26] Id. Gomez testified that she spoke to both Baca and Rivas about Plaintiff's complaints. See Doc. 30, Ex. E to Pl.'s Resp., Dep. of Gomez, pp. 14-15, 57.

[27] See Doc. 30, Ex. B to Pl.'s Resp., Pl.'s Decl. ¶ 18. Gomez recalled the meeting differently and denied that Plaintiff asked for a transfer at that meeting. See Ex. E to Pl.'s Resp., Dep. of Gomez, p. 10. Gomez could not recall when Plaintiff asked for a transfer, but testified that it was not at their first meeting. Id. at pp. 10, 63-64. Gomez explained that transfer requests were not always granted. An employee first filled out a form and, if a vacancy opened up, the selection went by seniority. Transfer requests could also be approved if they resulted in an even swap. Id. at p. 62.

[28] Doc. 22, Ex. B to Def.'s Mot. for Summ. J., Decl. of Rivas, p. 2.

[29] Id.

[30] Id.

Rivas a "stupid f**king lady."[31] When Rivas attempted to address this conduct with Plaintiff, Plaintiff stated that she was going to refer Rivas to a good doctor.[32]

On September 11, 2009, Rivas asked Plaintiff to clean the entrance to the school.[33] Plaintiff refused.[34] On September 17, 2009, and September 21, 2009, Rivas asked Plaintiff to clean several additional classrooms because Rivas was short-staffed on those days.[35] Plaintiff refused on both occasions.[36] On September 21, 2009, Rivas called her supervisor, Baca, who confronted Plaintiff about her refusal to follow Rivas's orders.[37] Plaintiff initially refused to comply with Baca's order to clean the additional areas, but eventually complied.[38]

On September 29, 2009, Rivas asked Plaintiff to assist by cleaning extra classrooms.[39] Plaintiff again refused, stating that she had a big area to clean and she had had "enough of the abuse."[40]

---

[31] Id.

[32] Id.

[33] Id.

[34] Id.

[35] Id.

[36] Id.

[37] Doc. 22, Ex. C to Def.'s Mot. for Summ. J., Decl. of Baca, p. 1.

[38] Id.

[39] Doc. 22, Ex. B to Def.'s Mot. for Summ. J., Decl. of Rivas, p. 2.

[40] Id.

Rivas documented these refusals to follow directives in an informal note.[41]

Ultimately, Rivas reported Plaintiff's insubordinate conduct to Baca.[42] Baca is of Mexican national origin.[43] On October 1, 2009, Baca officially counseled Plaintiff for the September 21, 2009, and September 29, 2009 incidents.[44] Baca warned Plaintiff that this type of behavior would not be tolerated.[45]

On the following day, October 2, 2009, Plaintiff left work two hours early, cleaning only two of the nineteen classrooms and two of three restrooms assigned to her.[46]

In October 2009, Plaintiff visited the Equal Employment

---

[41] Doc. 22, Ex. B to Def.'s Mot. for Summ. J., Decl. of Rivas, Attach. 1, Notes.

[42] Doc. 22, Ex. C to Def.'s Mot. for Summ. J., Decl. of Baca, p. 1.

[43] Id.

[44] Id.; see also id. at Attach. 2 to Baca's Declaration, Counseling Report (reflecting that Plaintiff was counseled about being uncooperative, using abusive language, refusing to obey orders and breaking employer's rules); Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., pp. 24-25 (stating that the first time Plaintiff spoke to Baca about Rivas was in October 2009). See also Doc. 22, Ex. C to Def.'s Mot. for Summ. J., Decl. of Baca, p. 1. In her deposition, Rivas testified that Plaintiff complained that she was being discriminated against because of her national origin only when she was assigned extra work on those occasions when everyone had to do extra work. See Doc. 30, Ex. C to Pl.'s Resp., Dep. of Rivas, pp. 26-27. Eventually, Plaintiff's work area was reduced. Id. at pp. 9-10. Rivas also testified that Plaintiff was written up for calling Rivas a "stupid guanaca." Id. at p. 20. The word "guanaca" literally translates to guanaco, which is a wild South American animal similar to a llama. See http://www.definitions.net/definition/guanaco. However, according to the Urban Dictionary, http://www.urbandictionary.com, guanaca is a term for a woman from El Salvador. The court assumes that the latter meaning was intended.

[45] Id. at p. 2.

[46] Doc. 22, Ex. C to Def.'s Mot. for Summ. J., Decl. of Aida Baca, p. 2.

Opportunity Commission ("EEOC").[47] Plaintiff did not file a complaint of discrimination at that time, but, acting on the suggestion of an EEOC employee, composed a letter outlining her complaints of discrimination.[48] The EEOC employee mailed a copy of this letter to KISD employee Scott Lamarr ("Lamarr"), who

---

[47] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 37.

[48] Id. at p. 38. The letter appears exactly as written:

> Dear Mr. Lamar through this letter I want to let you know what has been going on. The department of custodian where I work with Ms. Rivas my supervisor she has made fun of my nationality because I am Mexican. For example she has said that I didn't know that Mexican eat vegetables or that the kind of car that I drive only Mexicans drive it. Also she has said that here come the lady in the charro boots. In addition to this when I have asked her to send my paperwork for vacation days she refuses to do it.
>
> When I reported this to her supervisor, Ms. Vaca instead of trying to figure out what was going on she showed favoritism towards Ms. Rivas and she showed till the point where she insulted me verbally by saying "you think you're the victim your mind is sick your mentally ill." As soon as she told me "go ahead and tell no one will believe you anyways." When I reported her to Ms. Judy Gomes I believe she was actually going to help me but she would then tell me that the problem was me and nobody else.
>
> Every time I try to go to someone with more say to find a solution Ms. Rivas and Ms. Vaca would falsely accuse me of things I haven't even said or done. I truly believe at this point that this has become a personal problem towards me and that they have gotten anger or hold a grudge against me. In October 8, 2009 she came again to talk to me but she just offended me by saying that "your mind is dirty."
>
> She has always said that I complain that I have to much area to clean I report one thing and they use this as an excuse to try and hide what's really going on. Yes, it is true that I once reported that I had to much area, but that was a long time ago and right now that's not the issue the issue is of how Ms. Rivas treats me in the workplace and how when I try and reported so something can be done it seems that they just favor her because they keep saying that I am the problem and that I don't want to get along.

Doc. 30, Ex. B to Pl.'s Resp., Pl.'s Dep., Attach. 1, Letter to Lamarr.

supervised Baca and Gomez.[49] Lamarr received the letter on October 20, 2009, and set up a meeting with Plaintiff and Gomez on October 22, 2009.[50] After discussing with Plaintiff her complaints, Lamarr asked Plaintiff what she wanted to do about the problem.[51] Plaintiff responded that she wanted a transfer to another school, and, on October 26, 2009, Plaintiff was transferred to Morton Ranch Junior High.[52]

**2. Morton Ranch Junior High ("Morton Ranch")**

At Morton Ranch, Plaintiff worked the 2:30 p.m. to 11:00 p.m. shift with five other employees, including her supervisor.[53] Of the four custodians, two were Salvadorans, one was Nicaraguan and one was Mexican.[54] Plaintiff's supervisor, Rosa Callejas ("Callejas"), was Salvadoran.[55]

Plaintiff testified that despite observing that Callejas

---

[49] Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep. at p. 40. Plaintiff also attempted to hand-deliver a copy of this letter to Winborn's principal. After taking the letter into the principal's office, the principal's secretary returned the letter to Plaintiff, explaining that the principal "had nothing to do with this." Id. at p. 41. There is no evidence that Rivas was made aware of this letter.

[50] See Doc. 22, Ex. E to Def.'s Mot. for Summ. J., Decl. of Lamarr, p. 1.

[51] Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep. at p. 43.

[52] Id. at pp. 43-44.

[53] Id. at pp. 45-46.

[54] Id. at p. 46.

[55] Id. at p. 47.

mistreated[56] all the other employees, she had no difficulties working at Morton Ranch until December 2009.[57] According to Plaintiff, towards the end of December, Callejas told Plaintiff that she, Callejas, had spoken with Rivas and that Rivas had not given a "good report" about Plaintiff.[58] After that, Plaintiff stated that Callejas would curse at Plaintiff, using such words as "chingada," and "pendeja."[59] On one occasion, Callejas threw cleaning towels at Plaintiff, striking her on the hip.[60] Plaintiff testified that Callejas used strong language with everyone.[61] Conceding that Callejas never made fun of Plaintiff because of her Mexican national origin, Plaintiff complained that on one occasion, Callejas made a general statement that she would like to work with only Central-American people.[62]

Callejas testified that, at first, Plaintiff worked without

---

[56] Specifically, Plaintiff stated that Callejas used "strong" words and referred to the other employees as "old ladies." Id. at p. 49.

[57] Id.

[58] Id. at p. 48. Plaintiff admitted that she did not have an understanding about what Rivas had told Callejas. Rivas denied talking to Callejas about Plaintiff. See Doc. 30, Ex. C to Pl.'s Resp., p. 29.

[59] Id. at p. 49. According to the Urban Dictionary, pendeja is the feminine slang term meaning moron, idiot, or dumbass. See Urban Dictionary, http://www.urbandictionary.com/define/php?term=pendeja. Chingada generally means to be f**ked, screwed, or damned. See Urban Dictionary, http://www.urbandictionary.com/define.php?term=chingada. Both words are insults in Spanish.

[60] Id. at p. 50.

[61] Id. at p. 51.

[62] Id. at p. 51.

incident.[63] Callejas stated that she was not aware that Plaintiff had accused Rivas of discrimination or had gone to the EEOC.[64] After Plaintiff had been at Morton Ranch a few months, Callejas noticed that Plaintiff developed a poor attitude, responded negatively to constructive criticism and refused to complete her assigned work.[65]

On February 17, 2010, Plaintiff told Callejas that Plaintiff was leaving early because she was sick.[66] Callejas instructed Plaintiff to call in her absence to the appropriate people.[67] Plaintiff asked Callejas not to make her call in and, when Callejas refused, Plaintiff called her a "pinche guanaca," a profanity.[68] Callejas reported this incident to Gomez.[69]

On February 25, 2010, Plaintiff was called to Gomez's office to discuss the February 17, 2009 incident as well other complaints about Plaintiff's repeated refusals to perform her assigned duties. Gomez and Lamarr discussed with Plaintiff their observations that

---

[63] See Doc. 22, Ex. D to Def.'s Mot. for Summ. J., Decl. of Callejas, p. 4.

[64] Id.

[65] Id.

[66] Id.

[67] Id.

[68] Id. According to the Urban Dictionary, "pinche" is an all-purpose insult enhancer, roughly equivalent to "f**king" in English. See Urban Dictionary, http://urbandictionary.com/define.php?term=pinche.

[69] Id.

she was uncooperative with other employees and used abusive language.[70] Plaintiff received a second formal counseling report.[71] Plaintiff testified that these charges were false and that Callejas was the one who used vulgar language.[72]

On March 3, 2010, Plaintiff filed a complaint of discrimination with the EEOC.[73] Plaintiff was contacted by KISD's human resources department about the complaint.[74] Plaintiff, using Gomez as an interpreter, explained that Callejas constantly insulted her, screamed at her and threw towels at her.[75]

On March 30, 2010, Callejas met with Plaintiff to discuss her annual performance evaluation.[76] Plaintiff told Callejas that Callejas needed to prove to Plaintiff that she did the things of which she was accused and told Callejas that she could be fired because Plaintiff "went to the big people."[77]

In early April 2010, Sylinda Howard ("Howard"), Director of

---

[70] See Doc 22, Ex. E to Def.'s Mot. for Summ. J., Decl. of Lamarr, p. 2.

[71] See Doc. 22, Attach. 2 to Ex. D to Def.'s Mot. for Summ. J., Decl. of Callejas, Attach. 2, Counseling Report Dated February 25, 2010.

[72] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., pp. 54-55.

[73] Id. at p. 56.

[74] Id. at pp. 58-59.

[75] Id. at p. 59.

[76] See Doc. 22, Ex. D to Def.'s Mot. for Summ. J., Decl. of Callejas, p. 5.

[77] Id.

Human Resources for KISD, interviewed Callejas, Rivas, and Baca in response to Plaintiff's EEOC complaint.[78] Howard also interviewed Alfredo Pedrazo and Miguel Bueno as they were identified as witnesses to some the confrontations between Plaintiff and Callejas.[79] Pedrazo confirmed to Howard that he had witnessed Plaintiff call Callejas a "pinche guanaca."[80] Bueno also heard Plaintiff call Callejas a "pinche guanaca" and related to Howard that Plaintiff was a "very angry lady" and would frequently not do what Callejas asked Plaintiff to do.[81] Howard averred that she asked Plaintiff for the names of persons who had witnessed her mistreatment by Rivas, Baca or Callejas, but Plaintiff was unable to provide any names.[82] Howard interviewed five custodians who worked with Plaintiff, and none was able to confirm that Plaintiff was ever treated inappropriately.[83]

On April 19, 2010, Plaintiff was called to Lamarr's office to discuss the continuing performance issues that were documented in

---

[78] See Doc. 22, Ex. F to Def.'s Mot. for Summ. J., Decl. of Howard, p. 1.

[79] Id.

[80] Id.

[81] Id. at p. 2.

[82] Id.

[83] Id.

a new counseling report.[84] In addition to Plaintiff and Lamarr, Gomez and Baca also attended the meeting.[85] The meeting was videotaped.[86] Plaintiff was warned that continued refusals to comply with supervisors' directives and continued use of abusive language would result in termination.[87] Plaintiff testified that she was accused by the supervisors of being a witch and using black magic against Callejas.[88] In her declaration, Plaintiff added that she also was accused of having a bad attitude, being disrespectful and not performing her job.[89] At the meeting, Plaintiff denied any performance shortcomings and reiterated her complaints of discrimination and retaliation.[90] After the meeting concluded, Plaintiff asked to take the rest of the day off; Lamarr refused.[91] Plaintiff returned to her shift that day but did not return to work thereafter.[92] Plaintiff was terminated on April 26, 2010, for job

---

84 See Doc. 30, Ex. A to Pl.'s Resp., Dep. of Pl., p. 61; see also Doc. 22, Ex. D to Def.'s Mot. for Summ. J., Decl. of Callejas, Attach. 4, Counseling Report Dated April 19, 2010.

85 See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 61.

86 Id. This videotape has been lost.

87 See Doc. 22, Ex. D to Def.'s Mot. for Summ. J., Decl. of Callejas, Attach. 4, Counseling Report Dated April 19, 2010.

88 See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., pp. 61-62.

89 See Doc. 30, Ex. B to Pl.'s Resp., Pl.'s Decl., ¶ 25.

90 Id.

91 See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 62.

92 Id.

abandonment under KISD’s three-day “no show, no call” rule.[93]

**B. Procedural History**

Plaintiff filed this suit on February 14, 2011, alleging national origin and race discrimination, hostile work environment (national origin) and retaliation under Title VII and 42 U.S.C. § 1981 (“Section 1981"), as well as a state law claim for assault.[94] On May 31, 2011, Plaintiff filed an amended complaint, alleging discrimination and a hostile work environment based on her national origin under Title VII, clarifying that her race discrimination claim was brought pursuant to Section 1981, dropping the assault claim and adding a claim under 42 U.S.C. § 1983 for violation of the Equal Protection Clause of the Fourteenth Amendment.

On April 30, 2012, Defendant filed the pending motion for summary judgment on all claims. On June 19, 2012, Plaintiff filed her response to Defendant’s motion. In it, she dropped her claims arising under Section 1981 and Section 1983.[95] The court considers Defendant’s motion with respect to Plaintiff’s remaining claims under Title VII.

## II. Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the

---

[93] See Doc. 22, Ex. E to Def.’s Mot. for Summ. J., Decl. of Lamarr, p. 3.

[94] See Doc. 1, Pl.’s Orig. Compl.

[95] See Doc. 30, Pl.’s Resp., p. 25.

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, 337 F.3d 539, 540-41 (5th Cir. 2003). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. Anderson, 477 U.S. at 250; TIG Ins. Co. v. Sedgwick James of Wash., 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. Celotex Corp., 477 U.S. at 323; Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992). If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment. Celotex Corp., 477 U.S. at 322. In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence that establishes each of the challenged elements of the case,

demonstrating that genuine issues of material fact do exist that must be resolved at trial. Id. at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." Evans v. City of Houston, 246 F.3d 344, 348 (5th Cir. 2001); see also Boston Old Colony Ins. Co. v. Tiner Assocs. Inc., 288 F.3d 222, 227 (5th Cir. 2002). The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." Honore v. Douglas, 833 F.2d 565, 567 (5th Cir. 1987).

However, the nonmoving party must show more than "some metaphysical doubt as to the material facts." Meinecke v. H & R Block of Houston, 66 F.3d 77, 81 (5th Cir. 1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. Brown, 337 F.3d at 541; Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002). The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

## III. Analysis

Defendant moves for summary judgment on Plaintiff's claims of

hostile work environment, discrimination and retaliation under Title VII. The court turns to the merits of Defendant's motion.

**A. <u>Hostile Work Environment</u>**

Plaintiff alleges that she was subjected to a hostile work environment based on her claims of harassment by her supervisors Rivas, Baca, Gomez and Callejas. With respect to Rivas, Plaintiff complains that Rivas assigned Plaintiff the larger and dirtier work assignments, called her stupid, made several stereotypical comments about Plaintiff's car and what she ate, pushed dirty plates in her direction in the break room on three or four occasions and referred to her as the woman in charro boots.

Plaintiff claims that Baca contributed to the hostile work environment when she did not take Plaintiff's complaints about Rivas seriously, failed to immediately initiate a transfer upon Plaintiff's complaints and commented that Plaintiff had a victim mentality. Plaintiff complains that Gomez humiliated Plaintiff by not inviting her into Gomez's office to hear Plaintiff's complaints about Plaintiff's working conditions, and that Callejas called Plaintiff insulting names and threw towels at Plaintiff on one occasion.

In order to show a hostile work environment, Plaintiff must show that her working conditions "affected a term, condition, or privilege of employment." <u>Jones v. Flagship Int'l</u>, 793 F.2d 714, 719 (5th Cir. 1996). In addition, the complained-of conduct must

be "'so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the work place.'" Hockman v. Westward Commc'ns, LLC, 407 F.3d 317, 326 (5th Cir. 2004)(quoting Shepherd v. Comptroller of Pub. Accounts, 168 F.3d 871, 874 (5th Cir. 1999). In determining whether a work environment is "hostile" the court must look to all the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Jones v. La. Dept. of Health & Hosps., 471 F. App'x 344, 348-49 (5th Cir. 2012)(citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." Harris, 510 U.S. at 21.

**1. Winborn**

Turning first to whether Plaintiff has alleged a hostile work environment at Winborn, the court finds that her allegations fail to meet the "severe or pervasive" standard required. In doing so, the court has discounted Plaintiff's counsel's emotional characterization of events and focused on Plaintiff's actual testimony.

Plaintiff testified that Rivas called Plaintiff "stupid," made

several stereotypical comments referencing Plaintiff's Mexican national origin,[96] and pushed dirty plates in Plaintiff's direction on three or four occasions in the staff room. Plaintiff also complained that Rivas refused to let Plaintiff in the school's locked back door when Rivas opened the door for others and that Rivas gave Plaintiff the largest and dirtiest work assignments.

The conduct attributed to Rivas, referring to Plaintiff as "stupid" and pushing plates in Plaintiff's direction on several occasions does not raise a fact issue of a hostile work environment based on national origin. Rivas's alleged statements that disparaged Plaintiff's national origin in reference to the car she drove, the shoes she wore and the food she ate, while rude, do not go beyond merely offensive utterances. Because they were not at all severe, the comments would have had to have been almost a daily occurrence to raise a fact issue that the environment was hostile. According to Plaintiff, Rivas made these comments "several" or "many" times over the course of seven months. The evidence does not suggest the level of pervasiveness necessary to raise a fact issue on the issue of objective hostility.

In Plaintiff's post-deposition declaration, she averred, for the first time, that Rivas taunted her twice a week or more about her national origin. However, Plaintiff failed to disclose the

[96] In her deposition, Plaintiff testified that Rivas made comments about Plaintiff's car "many times," about the type of food Plaintiff ate "several times," and about Plaintiff's wearing charro boots "several times." See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep. pp. 15-17.

content of Rivas's statements, and the court will not speculate about what was said.[97] The summary judgment record does not support an inference that statements made by Rivas were so objectively severe or frequent as to raise a fact issue that they unreasonably interfered with Plaintiff's work performance.

Further, Plaintiff's conclusory testimony that she was assigned the largest and dirtiest jobs, while evidence of Plaintiff's subjective assessment of her work assignment, provides no evidence that it was objectively abusive or assigned to Plaintiff because of her national origin.

For similar reasons, the allegation that, in April and May 2009, Rivas refused to open the locked back door for Plaintiff and instructed others not to open the door does not raise a fact issue that Plaintiff was subjected to a severe or pervasive hostile work environment because of her national origin. It appears to be undisputed that the door was locked as a security measure and was locked at the direction of the school principal, not Plaintiff's supervisor. Plaintiff admitted that when she found she was locked out, she simply entered the school through the food service door and did so without incident.[98] During the summer months, all custodians worked the same schedule and Plaintiff's access to the

---

[97] Plaintiff may have been referring to the statements about her car, the food she ate and the charro boots; if so, as discussed above, those statements do not raise a fact issue of a hostile work environment because they were neither severe nor pervasive.

[98] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 23.

building was not an issue.[99] After the school year started, another employee opened the door for Plaintiff when she knocked.[100] The inconvenience experienced by Plaintiff in using the food service entrance for two months does not raise a fact issue of a severe or pervasive hostile work environment. After viewing all of Plaintiff's complaints concerning her working conditions at Winborn, the court concludes that Plaintiff has failed to raise a triable issue of fact that she was subjected to a hostile work environment on the basis of her national origin at Winborn.

**2. Morton Ranch**

The court next turns to Plaintiff's working conditions at Morton Ranch. There, Plaintiff admitted that she worked without incident from October 2009 to December 2009 despite the fact that her supervisor, Callejas, verbally mistreated the other custodians.[101] Plaintiff testified that in the first few months of 2010, Callejas, a Salvadoran, directed offensive language toward Plaintiff. Plaintiff admitted that Callejas also referred to two other female custodians of Salvadoran and Nicaraguan descent by the same offensive terms and used that type of vocabulary with everyone.[102] The only evidence offered in support of Plaintiff's

---

99 Id.

100 Id. at p. 24.

101 Id. at pp. 47-48.

102 Id. at pp. 46, 51.

contention that she was subjected to this verbal abuse because of her national origin was Plaintiff's testimony that Callejas made a general comment that she would rather work with Central-American people.[103] This comment was not directed at Plaintiff. In light of Plaintiff's admission that Callejas used offensive language with everyone, the court concludes that Plaintiff has failed to raise a fact issue that the name-calling was related to Plaintiff's national origin.

Plaintiff's testimony that Callejas threw cleaning towels at her on one occasion also fails to raise a fact issue that Plaintiff was subjected to a severe or pervasive hostile work environment because of her national origin.[104]

Finally, Plaintiff's allegation that Baca and Gomez created a hostile work environment by failing to favorably address Plaintiff's complaints about her immediate supervisors does not

---

[103] Id. at pp. 51-52. The colloquy was as follows:

Q. Did Rosa Callejas ever make fun of you because you were Mexican and she was Salvadoran?

A. The only thing that I heard her say one day was that she would like to work with just Central American people.

Q. And did she say that to you or was she talking to someone else?

A. In general.

Q. Okay. Other than that one comment, did she ever do or say anything else to you that you thought she was doing to make fun of you because you were Mexican?

A. No.

[104] Id.

raise a fact issue of a hostile work environment based on her national origin. There is no evidence in the summary judgment record that Baca or Gomez, both of Mexican national origin, took any action or failed to act because of Plaintiff's Mexican national origin. As the court has found that Plaintiff failed to raise a fact issue that she was subjected to a hostile work environment on the basis of her national origin at either Winborn or Morton Ranch, the fact that Baca and Gomez failed to favorably address Plaintiff's complaints concerning her supervisors does not change this conclusion.

Because the court recommends a finding that Plaintiff has not raised a fact issue of a hostile work environment based on her national origin at either Winborn or Morton Ranch, the court need not address whether Defendant is entitled to raise the Faragher/Ellerth[105] defense.

**B. National Origin Discrimination**

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

In the absence of direct evidence, courts analyze discrimination and retaliation claims under the burden-shifting

---

[105] See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).

approach first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and modified in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), and Rachid v. Jack In The Box, Inc., 376 F.3d 305 (5th Cir. 2004). Under this "modified McDonnell Douglas approach," a plaintiff may trigger a presumption of discrimination by establishing a prima facie case. Rachid, 376 F.3d at 312.

A prima facie case of discrimination requires the plaintiff to show that she: 1) is a member of a protected class; 2) was qualified for her position; 3) suffered an adverse employment action; and 4) was replaced by someone who is not a member of the protected class to which the plaintiff belongs or was treated less favorably than similarly situated employees of a different class. See Okoye v. Univ. of Tex. Houston Health Sci. Ctr., 245 F.3d 507, 512-13 (5th Cir. 2001)(addressing race discrimination claim). Proof of disparate treatment can establish the fourth element of the plaintiff's prima facie case. See Bryant v. Compass Group USA Inc., 413 F.3d 471, 478 (5th Cir. 2005), cert. denied, 413 U.S. 471 (2006); Okoye, 245 F.3d at 513. "To raise an inference of discrimination, the plaintiff may compare his treatment to that of nearly identical, similarly situated individuals." Bryant, 413 F.3d at 478.

Once a plaintiff has established a prima facie case, the burden shifts to the defendant to proffer legitimate, nondiscriminatory reasons for its actions. Okoye, 245 F.3d at 513.

If the defendant satisfies this burden, then the presumption of discrimination dissolves. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000); Price v. Fed. Express Corp., 283 F.3d 715, 720 (5th Cir. 2002).

The plaintiff must then offer evidence to create an issue of fact "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." Rachid, 376 F.3d at 312 (internal quotation and alteration marks omitted). If the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with evidence that the same employment decision would have been made regardless of discriminatory animus. Id.

The ultimate burden of persuasion remains with the plaintiff. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000). At the summary judgment stage, the court looks for "a conflict in substantial evidence to create a jury question regarding discrimination." Haynes v. Pennzoil Co., 207 F.3d 296, 300 (5 th Cir. 2000). The plaintiff must produce some evidence "demonstrating that discrimination lay at the heart of the employer's decision." Price v. Fed. Express Co., 283 F.3d 715, 720 5th Cir. 2002). Evidence of the falsity of an employer's stated justification may be enough, in some cases, to raise a fact issue

on pretext, but only if a reasonable jury could conclude that the action was discriminatory. Reeves, 530 U.S. at 147-48.

Here, there is no dispute that Plaintiff, a person of Mexican origin, is protected under Title VII from intentional discrimination based on her national origin. Defendant argues that Plaintiff cannot make out a prima facie case of discrimination on two grounds: (1) she was not subjected to an adverse employment action because she voluntarily left her job; and (2) she was not treated less favorably than a similarly-situated employee.[106]

**1. Adverse Employment Action - Constructive Discharge**

In this circuit, an adverse employment action includes "only ultimate employment decisions such as hiring, granted leave, discharging, promoting or compensating." McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir. 2007). Plaintiff concedes that she was not terminated from her position but argues that she was forced to resign as a result of the following actions: (1) KISD failed to take action when Plaintiff complained about Rivas; (2) KISD did not immediately transfer Plaintiff when she complained about Rivas; (3) Rivas assigned Plaintiff the worst jobs; (4) Rivas refused to unlock the back door of Winborn Elementary to allow Plaintiff access; (5) Baca told Plaintiff that she had a victim

[106] Plaintiff objects that this latter argument was not raised in Defendant's motion for summary judgment but appeared for the first time in Defendant's reply brief. See Doc. 32, Pl.'s Sur-Reply, p. 1. This objection is **OVERRULED.** The court will consider all arguments raised in all briefs of the parties.

mentality; (6) Plaintiff was subjected to unwarranted disciplinary actions; (7) Lamarr did not investigate Plaintiff's complaints before transferring her to another school; (8) Callejas told Plaintiff that she preferred to work with people from Central America, assaulted Plaintiff with towels and otherwise humiliated her; and (9) the April 19, 2010 meeting with supervisors was videotaped, the supervisors told her they did not believe her complaints and Lamarr denied her request to take off the rest of the day.

In order to prove that she was constructively discharged, Plaintiff must show "working conditions . . . so intolerable that a reasonable person in the employee's position would have felt compelled to resign." Nassar v. Univ. of Tex. Sw. Med. Ctr., 674 F.3d 448, 453 (5th Cir. 2012)(internal citations and quotation marks omitted). The Fifth Circuit has identified six events to consider when determining whether an employee was compelled to resign: (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. See Dediol v. Best Chevrolet, Inc., 655 F.3d 435, 444 (5th Cir. 2011)(citing Brown v. Kinney Shoe Corp., 237 F.3d 556,

566 (5th Cir. 2001)).

Here, Plaintiff claims that she was badgered, harassed and humiliated by her immediate supervisors at Winborn and Morton Ranch and was documented for performance infractions fourteen times between April 2009 and April 2010.

The court takes issue with the scope of Plaintiff's claim of actionable conduct resulting in a constructive discharge. It is undisputed that Plaintiff requested and received a transfer from Winborn in October 2009. Because she remained employed at KISD, she cannot complain that she was constructively discharged from Winborn.

The court turns to whether the summary judgment record supports a claim of constructive discharge from Morton Ranch. As discussed above, Plaintiff complained that her supervisor, Callejas, engaged in frequent derogatory name-calling, stated on one occasion a general desire to work with only Central Americans, and once threw a towel or several towels at Plaintiff.

The Fifth Circuit further explained that there must be "'a greater severity of pervasiveness or harassment than the minimum required to prove a hostile work environment.'" Dediol, 655 F.3d at 444 (quoting Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998)). The court has already determined that Plaintiff did not raise a fact issue of a severe or pervasive hostile work environment at Morton Ranch based on Plaintiff's national origin,

and therefore, this conduct cannot meet the threshold required for a claim of a constructive discharge based on national origin.

However, in addition to the above-stated conduct, Plaintiff complains that she was documented for performance shortcomings while at Morton Ranch from February 2010 until April 2010. The summary judgment evidence showed that Plaintiff was officially counseled for insubordination and other performance issues on February 25, 2010. Plaintiff received her annual performance review on March 30, 2010, at which time she was again reminded of certain performance shortcomings. Finally, on April 19, 2010, Plaintiff's last working day, she was counseled about continued insubordination.

However, counselings concerning an employee's work performance and annual performance evaluations are a routine part of a working environment and generally will not raise a fact issue of a working environment that was so intolerable that a reasonable person would feel compelled to resign. In this case, the court has found that the alleged verbal harassment and one instance of being hit with a towel was not so egregious as to compel Plaintiff to resign. The additional two counselings for insubordination and one negative performance evaluation received by Plaintiff do not change this result.

**2. Similarly Situated Comparator**

Even if Plaintiff has raised a fact issue of constructive

discharge, Defendant argues, Plaintiff's prima facie claim of discrimination also fails because she has offered no evidence that she was either replaced by a person of non-Mexican national origin or that a similarly situated non-Mexican employee was treated more favorably than she. In response, Plaintiff cites the court to her declaration wherein she averred that: (1) at Winborn she was assigned "the largest and dirtiest areas of the school to clean;"[107] (2) her supervisor at Winborn made comments about her nationality and disciplined her unfairly;[108] (3) her supervisor at Morton Ranch disciplined her unfairly; (4) an April 2010 counseling session with upper level supervisors was videotaped; and (5) at that April counseling session, Plaintiff was reprimanded without cause and told that her job was in jeopardy.[109]

The court has determined that, for purposes of determining whether Plaintiff suffered an adverse employment action, that is, whether she was constructively discharged, the court would only consider the Defendant's actions that occurred at Morton Ranch. Looking then, at the disparate treatment alleged to have occurred at Morton Ranch, Plaintiff merely claims that she was unfairly treated, without alleging the existence a similarly situated comparator. Plaintiff's subjective opinion concerning the

---

[107] See Doc. 30, Ex. B to Pl.'s Resp., Pl.'s Decl., ¶ 12

[108] Id. at ¶ 13.

[109] Id. at ¶¶ 24-25.

unfairness of any particular action is insufficient to satisfy the McDonnell Douglas requirement that a plaintiff must allege the existence of a similarly situated person who was treated more favorably. Hypolite v. City of Houston, Tex., No. 12-20065, 2012 WL 4858198 *6, (5th Cir. Oct. 15, 2012)(concluding that two plaintiffs failed to allege a prima facie case of discrimination with respect to two promotions because they failed to allege that persons outside their protected class were treated more favorably); see also Roberson v. Alltel Info. Servs., 373 F.3d 647, 654 (5th Cir. 2004)(finding that a plaintiff's subjective belief that he was not selected for a position because of his race or age was not sufficient to create an inference of a discriminatory intent); Ramsey v. Henderson, 286 F.3d 264, 269 (5th Cir. 2002)("This Court has cautioned that conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment.")(internal quotation marks omitted).

Without summary judgment evidence that a similarly situated person was treated more favorably than she, Plaintiff's prima facie case of national origin discrimination must fail. In light of these two alternative findings, the court does not proceed to consider whether Defendant has raised a legitimate, non-discriminatory reason for its actions or whether Plaintiff has raised a fact issue that Defendant's actions were a pretext for

discrimination.

**C. Retaliation**

In order to establish a prima facie case of retaliation, Plaintiff must establish that: (1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action. McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2007)(citations omitted). Evidence that the adverse employment action "was based in part on knowledge of the employee's protected activity" will satisfy the causal link element. Medina v. Ramsey Steel Co., 238 F.3d 674, 684 (5th Cir. 2001) (internal quotation marks and citation omitted).

If the employee meets this burden, the employer must proffer "a legitimate, non-discriminatory reason for the employment action." Byers v. Dallas Morning News, Inc., 209 F.3d 419, 425 (5th Cir. 2000). Then, if the employer provides such a reason, the burden shifts back to the employee to establish the existence of a triable issue of fact that the employer's reason is pretextual. Medina, 238 F.3d at 685. Although analytically almost "identical to the 'causal link' step in the prima facie case, the burden here is more stringent. The plaintiff must reveal a conflict in substantial evidence on the ultimate issue of retaliation in order to withstand a motion for summary judgment." Id. (internal

quotation marks and citation omitted).

Here, Plaintiff argues that she engaged in protected activities under Title VII in "April 2009, June or July 2009, October 2009, and then again in April 2010."[110] Defendant does not dispute that Plaintiff engaged in activities protected by Title VII when she complained to supervisors about discrimination, but contends that Plaintiff cannot show the remaining two elements of a prima facie case of retaliation. The court first turns to whether Plaintiff has alleged an adverse employment action.

Generally, in the context of discrimination claims, "adverse employment action" has been defined to include only ultimate employment decisions such as hiring, granting leave, discharging, promoting or compensating. See McCoy, 492 F.3d at 559. However, in the context of a claim of retaliation, the definition of an adverse employment action is more expansive. In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 57 (2006), the Supreme Court held that Title VII's antiretaliation provision covers more than simply ultimate employment actions, but covers actions that produces "an injury or harm." Id. at 67. The Court stated, "In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Id. at 68

---

[110] See Doc. 30, Pl.'s Resp., p. 22.

(internal citations and quotation marks omitted). The Court cautioned that it was imperative to separate significant from trivial harms because Title VII did not set forth a "general civility code for the American workplace." Id. (citing Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). Whether an action would have dissuaded a reasonable employee from engaging in a protected activity is to be judged using an objective standard. White, 548 U.S. at 68.

Plaintiff argues that she was subjected to "multiple adverse actions" that culminated in a constructive discharge and refers the court generally to her summary judgment evidence in support of a constructive discharge.[111] However, it is not the court's duty to "sift through the record in search of evidence to support a party's opposition to summary judgment." Forsyth v. Barr, 19 F.3d 1527, 1537 (5th Cir. 1994). The court considers only those arguments expressly made by Plaintiff in her pleadings. Those are: (1) Plaintiff's transfer requests were denied on multiple occasions; (2) Plaintiff's conduct was documented on fourteen occasions from April 2009 to April 2010; (3) Plaintiff was harassed by her supervisors; and (4) Plaintiff was subjected to humiliating treatment following her complaints of harassment.[112] Defendant argues that many of Plaintiff's complaints do not rise to the level

---

[111] See Doc. 30, Pl.'s Resp., p. 22.

[112] Id. at pp. 23-24.

of adverse employment actions. The court considers the arguments of the parties.

At Winborn, Plaintiff complained that her supervisor made disparaging comments about the car she drove and the food she ate in connection with her Mexican heritage. Plaintiff also complained that her supervisor pushed dirty plates in her direction on a few occasions and enforced the school's security policy by not opening a locked door for Plaintiff. These actions are the sort of trivial, workplace conflicts that do not rise to the level of an objective adverse employment action. See Stewart v. Miss. Transp. Comm'n, 586 F.3d 321, 331 (5th Cir. 2009)(stating that the purpose of the objective standard is to separate significant from trivial harms such as the sporadic use of abusive language, gender-related jokes, and occasional teasing).

Plaintiff also complains that, at Winborn, she was assigned "the largest and dirtiest" areas of the school to clean. The court is mindful of the Supreme Court's admonition in White that more arduous duties and less desirable work assignments could provide a basis for finding a job reassignment to be materially adverse. White, 548 U.S. at 71. However, as discussed earlier, Plaintiff provides no factual detail concerning this contention and the court lacks the ability to determine whether the work assignment was objectively so unreasonable when compared with the work assignments of other employees that a reasonable employee would have been

dissuaded from complaining of discrimination.[113]

On the other hand, Plaintiff received several counselings from senior supervisors for insubordinate behavior to her immediate supervisor.[114] On September 21, 2009, Baca traveled to Winborn Elementary to personally address Rivas's complaint that Plaintiff had refused to clean an extra area when Rivas was short of workers that day.[115] Baca instructed Plaintiff to clean the area.[116] Plaintiff initially refused to comply with Baca's order but eventually did as she was ordered.[117] Several days later, Plaintiff again refused an order to clean an additional area.[118] On October 1, 2009, Plaintiff received a written counseling for both incidents.[119] Plaintiff later received written counselings on February 25, 2010, and April 19, 2010, for insubordination at Morton Ranch.

---

[113] Alternatively, it does not appear from the record that Plaintiff's work load increased after her complaints of discrimination. Rather, the evidence shows that Plaintiff complained about her work area and, in response, her work area was reduced. Thus, the summary judgment record does not raise a fact issue of a causal connection between Plaintiff's work assignment and her protected activity.

[114] While Plaintiff focuses the court's attention on the number of times her behavior was documented in her supervisors' files, the court finds that the more appropriate focus is on the number of times she was actually disciplined.

[115] See Doc. 22, Ex. C to Def.'s Mot. for Summ. J., Decl. of Baca, p. 1.

[116] Id.

[117] Id.

[118] Id.

[119] Id.; see also Doc. 22, Ex. C to Def.'s Mot. for Summ. J., Decl. of Baca, Attach. 2, Counseling Rept. Dated Oct. 1, 2009.

A written reprimand is an adverse employment action. See Southard v. Tex. Bd. of Crim. Justice, 114 F.3d 539, 555 (5th Cir. 1997). Thus, Plaintiff has satisfied the second prong of her prima facie of retaliation with respect to the three counselings outlined above.

Plaintiff also complains that while at Winborn, she was refused a transfer by Baca and Gomez in retaliation for her complaints of discrimination. The evidence supporting this allegation is not clear: Plaintiff testified that she asked Baca for a transfer and Baca responded that they were not making transfers at the time, but maybe at a later time.[120] At her deposition, Plaintiff could not recall when she asked Gomez for a transfer but averred it was several days after she spoke to Baca.[121] Several minutes later, Plaintiff testified that she asked Baca for a transfer in June or July and asked Gomez for a transfer in September.[122] Baca testified that Plaintiff verbally told Baca several times that she wanted a transfer, and that she (Baca) told Plaintiff to put in a written request for a transfer.[123] There is no evidence in the record that Plaintiff ever filed the paperwork to initiate a transfer or that a position was available at another

---

120 See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 34.

121 Id. at p. 35.

122 Id. at pp. 35-36.

123 See Doc. 30, Ex. D to Pl.'s Resp., Dep. of Baca, p. 12.

school.

Although the testimony is vague, somewhat confusing and unclear if Plaintiff ever filed the paperwork to initiate a transfer, the court deems it sufficient to satisfy Plaintiff's burden of alleging an adverse employment action.

However, the court disagrees that Plaintiff has alleged a prima facie case of retaliation based on a claim that Lamarr retaliated against her by not transferring Plaintiff sooner to Morton Ranch. The summary judgment evidence shows that Lamarr received Plaintiff's letter on or about October 20, 2009, and that he met with Plaintiff to discuss her complaints of discrimination on October 22, 2009.[124] At that meeting, Lamarr agreed to transfer Plaintiff to another school and Plaintiff was transferred to Morton Ranch on October 26, 2009.[125] These facts do not raise a fact issue of retaliation because there is no evidence that the transfer was delayed in any material respect.

Finally, Plaintiff complains that she was harassed and humiliated at Morton Ranch when Callejas called her offensive names after Callejas allegedly received a "bad report" about Plaintiff from Rivas. Plaintiff failed to detail the pervasiveness of the

---

[124] See Doc. 22, Ex. E to Def.'s Mot. for Summ. J., Decl. of Lamarr, p. 1.

[125] Id. at p. 2. In her deposition, Plaintiff admitted that she was transferred to Morton Ranch "two or three" days after her meeting with Lamarr. See Ex. A to Doc. 30, Pl.'s Resp., Pl.'s Dep., p. 44.

conduct, stating only that it was "frequent."[126] However, the court deems frequent and offensive name-calling to raise a fact issue of an adverse employment action in the context of a claim of retaliation.

The court next turns to whether Plaintiff has alleged a causal connection between the adverse employment actions (the counselings, the Baca/Gomez failures to transfer Plaintiff from Winborn to another school and the name-calling by Callejas) and her protected activity. Plaintiff generally alleges that a causal connection can be shown by the close timing between a protected activity and any adverse action. The case law has held that a lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes. See Schirle v. Sokudo, USA, L.L.C., No. 11-10788, 2012 WL 3100879 at *5 (5th Cir. July 31, 2012)(citing Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001)).

Here, the challenged adverse actions occurred, more or less, within four months of the complaints of national origin discrimination. That is sufficient, generally, to meet her prima facie case of retaliation with respect to the surviving adverse actions. See Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001)(noting that a time lapse of up to four months has been sufficient to establish a prima facie case).

Defendant argues that Plaintiff cannot allege a causal

[126] See Doc. 30, Ex. A to Pl.'s Resp., Pl.'s Dep., p. 51.

connection between her protected activity at Winborn and the two counselings and verbal abuse at Morton Ranch because there is no evidence that Callejas was aware of Plaintiff's complaints of discrimination regarding her former supervisor, Rivas.[127]

Plaintiff cites her own testimony in support of a causal connection – that Callejas told Plaintiff that she had spoken to Rivas and that Rivas had given her a "bad report." However, it would be speculative to assume, as Plaintiff does, that a "bad report" must mean that Rivas told Callejas that Plaintiff had accused her of discrimination.[128] As speculative evidence is not admissible, there is no competent summary judgment evidence that could support a finding that Callejas was aware that Plaintiff had engaged in a protected activity and retaliated against her by calling her offensive names and instigating complaints concerning her job performance. Thus, the court finds that Plaintiff has not alleged a prima facie case of retaliation with respect to the actions taken by Callejas.

On the other hand, it is undisputed that Baca, Gomez and Lamarr were aware of Plaintiff's protected activities. With that in mind, the court considers whether Defendant has articulated a

[127] See Doc. 22, Def.'s Mot. for Summ. J., p. 22.

[128] Callejas denied knowing that Plaintiff had accused Rivas of discrimination. See Doc. 22, Ex. D to Def.'s Mot. for Summ. J., Decl. of Rosa Callejas, ¶ 2. While the court credits Plaintiff's testimony that the statement was made, it is just as likely that a "bad report" could refer to Plaintiff's performance and insubordination issues at Winborn.

legitimate, non-discriminatory reason for each of the disputed counselings and the failures by Baca and Gomez to transfer Plaintiff when she initially complained of discrimination.

Turning first to the transfer issue, Baca testified that, over the years, Plaintiff frequently complained about her work assignments.[129] Years earlier, Plaintiff had transferred from Morton Ranch to McRoberts Elementary.[130] Baca testified that Plaintiff approached her and aggressively complained that her assignment at McRoberts was too much work.[131] When Baca told her that she had been a custodian and could not be fooled, Plaintiff laughed and conceded that she was not happy with the shift at McRoberts and wanted another transfer.[132] Plaintiff was eventually transferred to Winborn.[133] When Plaintiff sought a transfer from Winborn, it was after Rivas complained that Plaintiff was not finishing her work assignments; and, based on Baca's experiences with Plaintiff, Baca did not view Plaintiff's transfer request as a means to extricate herself from a discriminatory environment but

---

[129] See Doc. 31, Ex. J to Def.'s Reply to Pl.'s Resp. ("Def.'s Reply") Dep. of Baca, p. 10. Baca did not recall that Plaintiff ever complained that Rivas, a Salvadoran, discriminated against her because of her Mexican national origin. Id. at p. 9. Baca did recall that Plaintiff would bring up her Mexican heritage, "but not it ever being a problem, because she would complain about other things so much that it was just – you know, it was just part of it." Id. at p. 10.

[130] Id. at p. 13.

[131] Id.

[132] Id.

[133] Id. at p. 14.

mere dissatisfaction with a work assignment.[134] Baca also testified that employees were not automatically allowed to transfer but were put on a transfer list and transfers were granted depending on the school district's needs at the time.[135] Baca knew that Plaintiff wanted a transfer back to Morton Ranch, but also knew that the head custodian at Morton Ranch did not want Plaintiff back.[136]

Gomez testified that at the time Plaintiff first made a complaint of discrimination against Rivas, Plaintiff did not ask for a transfer.[137] Gomez investigated Plaintiff's complaint and learned from Rivas that Plaintiff was being insubordinate, aggressive and using foul language.[138] Gomez testified that the transfer procedure required a form and a transfer decision was based on vacancies and seniority, or, if there were reciprocal requests for transfers, an even swap of employees might also be

---

[134] Id. at p. 21. Baca testified:

A. [Plaintiff] would never call just to make a complaint. It was if we were doing a counseling report or something that she would – or "I" – "I don't finish my area because I have too much," so she would complain there if [Rivas] said something.

Q. She never complained first, on her own?

A. No. Like she would never go to the office or call a meeting. She would never do that. It was when we were approaching her for something specifically, like, you know, not finishing your area, and then she would say, "Okay, well, I have too much area," and that's how I reduced her area.

[135] Id. at p. 12.

[136] Id. at p. 31.

[137] Doc. 30, Ex. E to Pl.'s Resp., Dep. of Judy Gomez, p. 10.

[138] Id. at pp. 11-12.

accommodated.[139] Gomez explained that she did not move Plaintiff when she complained of discrimination because Plaintiff had not asked for a transfer and Gomez wanted time to determine what was going on at Winborn.[140]

In light of the above testimony, Defendant has articulated legitimate, non-discriminatory reasons for not immediately transferring Plaintiff to another school when she first demanded transfers. The court next considers whether the summary judgment record supports a legitimate, non-discriminatory reason for the counselings Plaintiff received on October 1, 2009, February 25, 2010, and April 19, 2010.

On October 1, 2009, Plaintiff was counseled for refusing to clean her assigned areas on September 21, 2009, and September 29, 2009.[141] The conduct on September 21, 2009, was witnessed by Rivas and Baca, and, on September 29, 2009, Plaintiff again refused an order from Rivas to help clean an area.[142] On February 25, 2009, Plaintiff was counseled for being disrespectful and directing vulgar language at Callejas.[143] The use of vulgar language was

---

139 Id. at p. 62.

140 Id. at pp. 63-64.

141 See Doc. 22, Ex. C to Def.'s Mot. for Summ. J., Decl. of Aida Baca, p. 1.

142 Id.

143 See Doc. 22, Ex. D to Def.'s Mot. for Summ. J., Decl. of Rosa Callejas, p. 4.

witnessed by two co-workers, Alfredo Pedrazo and Miguel Bueno.[144] On April 19, 2009, Plaintiff was counseled for failing to follow her supervisor's directions and using inappropriate language.[145] Defendant has articulated legitimate, non-discriminatory reasons for each counseling session.

Plaintiff avers that she was not insubordinate and did not use vulgar language and, thus, claims she has satisfied her burden of showing that Defendant's actions were a pretext for retaliation. But analyzing evidence of pretext is not so simple. Here, the allegedly retaliatory counselings were imposed by Gomez on October 1, 2009,[146] and by Lamarr on February 25, 2010, and April 19, 2010.[147] Thus, the court must look to whether there is evidence that Gomez and Lamarr, the decisionmakers, falsely accused Plaintiff of insubordination and using vulgar language in retaliation for her protected activity.

Turning first to the October 1, 2009 counseling by Gomez, this arose out of behavior witnessed by Rivas and Baca and was

---

144 Id. at Attachs. 1 and 2; see also Ex. F, Decl. of Howard, p. 2.

145 Id. at p. 5.

146 See Doc. 22, Ex. C to Def.'s Mot. for Summ. J., Decl. of Baca, Attachs. 2 and 4 Counseling Reports.

147 See Doc. 22, Ex. D to Def.'s Mot. for Summ. J., Decl. of Callejas, Attach. 2, Counseling Report.

documented by both women in informal notes.[148] The record also shows that in 2007, Plaintiff had been disciplined for talking loudly and rudely to a supervisor when she worked at another school.[149]

There is no evidence in the record that raises an inference that Gomez acted as a cat's paw for either Baca's or Rivas's alleged retaliatory animus. See Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226-27 (5th Cir. 2000)(stating that if the formal decisionmakers acted as a conduit for another's prejudice, the innocence of the decisionmakers would not spare the company from liability). And, other than a mere overlap in time between Plaintiff's protected activity and Plaintiff's supervisors' continued issues with her job performance, the evidence does not raise an inference that Gomez herself had a retaliatory animus against Plaintiff, or that Gomez caused Rivas and Baca to instigate false claims against Plaintiff because of her protected activity.

Turning to the February and April 2010 counselings signed by Lamarr, those counseling were based on complaints by Callejas that Plaintiff was insubordinate and used vulgar language. On one occasion, Plaintiff's use of vulgar language was witnessed by two coworkers. As discussed earlier, the record does not raise a fact

---

148 See Doc. 22, Ex. C to Def.'s Mot. for Summ. J., Decl. of Baca, Attach. 1, Note to File dated 9/21/09; Doc. 22, Ex. B to Def.'s Mot. for Summ. J., Decl. of Rivas, Attach. 1, Notes to File, pp. 2-3.

149 See Doc. 30, Ex. F to Pl.'s Resp., Def.'s EEO Position Statement, p. 3.

issue that Callejas was aware that Plaintiff had engaged in a protected activity and Plaintiff has not provided the court with evidence that would raise an inference that Lamarr had any reason to doubt the truth of the accusations that Plaintiff was insubordinate. Before the April 19, 2009 counseling for continued insubordination, the investigation by KISD's Human Resources manager did not uncover any evidence that Plaintiff was mistreated by any supervisor but verified Callejas's complaints that Plaintiff verbally abused Callejas. In addition, Plaintiff had been accused of similar insubordinate behavior at Winborn and at another school in 2007.

The court is mindful that it must view the evidence in the light most favorable to the nonmoving party. However there is no genuine issue for trial "[i]f the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party." Kipps v. Caillier, 197 F.3d 765, 768 (5th Cir. 1999). Plaintiff must do more that simply deny that an event took place to raise an inference of pretext for retaliation.

In light of the foregoing, Plaintiff cannot raise a fact issue of pretext for retaliation.

## IV. Conclusion

It is therefore **RECOMMENDED** that Defendant's Motion for Summary Judgment (Doc. 22) be **GRANTED.**

The Clerk shall send copies of this Memorandum and

Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** this 7th day of December, 2012.

Nancy K. Johnson
United States Magistrate Judge